IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PHOENIX ENTERTAINMENT PARTNERS,
LLC
            Plaintiff,

            v.

48 H & Y DUET INC. d/b/a KARAOKE
DUET 48, EIGHTH AVENUE H & Y DUET
INC. d/b/a KARAOKE DUET 53, 35 H & Y
DUET INC. d/b/a KARAOKE DUET 35, and
YOUNG KEE HAM

            Defendants.

CASE NO.: 15.8502

## COMPLAINT

The Plaintiff, PHOENIX ENTERTAINMENT PARTNERS, LLC ("PEP"), by its

counsel, complains against  Defendants 48 H & Y Duet Inc. d/b/a Karaoke Duet 48, Eighth

Avenue H & Y Duet Inc. d/b/a Karaoke Duet 53, 35 H & Y Duet Inc. d/b/a Karaoke Duet 35,

and Young Kee Ham and alleges as follows:

### JURISDICTION AND VENUE

1.       This is an action for trademark infringement and unfair competition arising

under 15 U.S.C. §§ 1114 and 1125. This Court has exclusive jurisdiction over the subject

matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the

laws of the United States.

2.       This Court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this

civil action arises under an Act of Congress relating to trademarks, and, as to PEP's Lanham

Act unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with

information and belief, 48 H & Y Duet Inc. is owned and operated by Defendant Young Kee Ham.

8.      Upon information and belief and at all times hereinafter Defendant Eighth Avenue H & Y Duet Inc. is a New York corporation that operates a commercial establishment known as "Karaoke Duet 53" at 900 8th Avenue (Basement) in New York, New York 10019, where karaoke entertainment is provided. Upon information and belief, Eighth Avenue H & Y Duet Inc. is owned and operated by Defendant Young Kee Ham.

9.      Upon information and belief and at all times hereinafter Defendant 35 H & Y Duet Inc. is a New York corporation that operates a commercial establishment known as "Karaoke Duet 35" at 53 West 35th Street (2nd Floor) in New York, New York 10001, where karaoke entertainment is provided. Upon information and belief, 35 H & Y Duet Inc. is owned and operated by Defendant Young Kee Ham.

## FACTS

*Karaoke and PEP Background Facts*

10.     Karaoke is a popular form of participatory entertainment commonly found in bars and restaurants and other types of venues throughout the United States.

11.     The basic premise of a karaoke show is that the entity hosting the show provides patrons with access to a sound system and specially prepared karaoke accompaniment tracks, so that individual patrons may perform for the crowd.

12.     Generally, a "karaoke accompaniment track" is a re-recorded version of a popular song without the lead vocals in a specialized format that includes a graphical component containing a lyric display, cueing information, and other information.  The graphical component

is synchronized to the music and is displayed to the patron who is performing and, typically, to the crowd as well.

13.    Venues that offer karaoke entertainment do so primarily as a free service, but with the commercial purpose of enticing patrons to come to their establishments and purchase food and beverages.

14.    The purchase and consumption of alcoholic beverages in connection with karaoke shows is particularly encouraged to enable patrons to overcome inhibitions against singing in public.

15.    PEP is the owner of SOUND CHOICE ("SOUND CHOICE"), a well-known and leading brand of karaoke accompaniment tracks that is particularly well known to commercial karaoke operations including bars, restaurants, and other venues as described above.

16.    PEP has succeeded Slep-Tone Entertainment Corporation ("Slep-Tone"), by assignment, in all interest in the SOUND CHOICE brand.

17.    Over the course of nearly three decades in business, Slep-Tone re-recorded and released in excess of 16,500 SOUND CHOICE-branded popular songs on special compact discs known as CD+G ("compact disc plus graphics") discs and, more recently, a subset of that catalog in another common karaoke format, MP3+G ("MP3 plus graphics").

18.    SOUND CHOICE-branded karaoke tracks are wildly popular among karaoke entertainment providers, patrons, and home consumers.  According to some estimates, more than half of all accompaniment tracks played at karaoke shows in the United States originated from Slep-Tone's recordings.

19.     The popularity of SOUND CHOICE karaoke tracks derives from the market's perception that the recordings are usually the most faithful to the sound of the original recording artist, a characteristic highly valued by karaoke singers.

20.     SOUND CHOICE karaoke tracks are also perceived by the market as providing highly accurate singing cues as part of the video display, a characteristic that is also highly valued by karaoke singers.

21.     Slep-Tone and its successor PEP have released their karaoke tracks for commercial users <u>only</u> on compact discs and not on any other form of carrier (such as computer hard drives or through internet downloads).

22.     In the beginning, Slep-Tone released its karaoke tracks on cassette tapes as well, but that technology was focused on the home consumer and has since become fully obsolete.

23.     Over time, it has become technologically possible to create karaoke accompaniment tracks, using the SOUND CHOICE CD-based tracks as a template, for storage on alternative media, such as computer hard drives.

24.     In most cases, the creation of such non-original tracks results in an imitation of a SOUND CHOICE track, which imitation is inferior to the original because of digital compression of the data as the format is converted from native CD+G audio and graphics to compressed audio and graphics.

25.     In a typical bar or restaurant environment and since the imitation tracks still bear the SOUND CHOICE trademarks, when the tracks are used the SOUND CHOICE trademarks are broadcasted or published to the general public or specific market segment to advertise the establishment's goods, products or services for the purpose of attracting customers or supporters.

26.     The process outlined above is known as "media-shifting," because the information is being copied or shifted from one medium to another, and "format-shifting," because the information is being copied or shifted from one format to another.

27.     Media-shifting and format-shifting are undertaken for a number of purposes, some reasonable and others illicit.

28.     Users of karaoke accompaniment tracks usually find that the use of media-shifted tracks provides them with greater ease of use of the content, which can be stored on a hard drive and accessed quickly without having to insert discs into a player, and can protect the user's discs from excessive wear, damage, loss, or theft.

29.     Prior to 2007, Slep-Tone prohibited media-shifting and format-shifting of its products entirely, and its products carried warnings against the unauthorized duplication that media-shifting and format-shifting require.

30.     In order to enable legitimate owners of original discs the convenience of format-shifting and media-shifting, starting in 2009, Slep-Tone instituted a Media Shifting Policy ("MSP")—which PEP has continued—whereby legitimate owners could gain permission for media-shifting and format-shifting.

31.     That policy requires disc owners to notify Slep-Tone of their intent to media-shift, or that they have completed a media-shift.

32.     That policy also requires disc owners to maintain a condition known as "1-to-1 correspondence" between the discs they own and the media (such as hard drives) to which they media-shift.

33.     For example, a disc owner who wants to have two hard drives with the same media-shifted content, the disc owner must own two original discs representing that content.

34.     The policy also requires disc owners to undergo an audit of their holdings to verify 1-to-1 correspondence and the integrity of the media-shifted tracks.

35.     The policy also requires disc owners to maintain ownership and possession of the discs and to put discs from which content has been media-shifted "on the shelf," i.e., out of use of any type while the content is media-shifted.

36.     Unfortunately, easy electronic duplication of media-shifted tracks has resulted in the widespread distribution of media-shifted karaoke tracks unaccompanied by the ownership of any discs at all.

37.     This distribution allows karaoke accompaniment track users to gain the benefit of what appear to be Slep-Tone karaoke tracks without paying for original discs.

38.     Karaoke accompaniment track users have used the available technology to place the duplicated contents of one purchased disc on two or more computer systems for simultaneous use; to place the duplicated contents of their patrons' discs on their own computer hard drives at a show; to "swap" song files with other users; to obtain and share karaoke tracks via file-sharing sites and torrents; to purchase computer hard drives that were pre-loaded with duplicates of karaoke tracks; and to sell any original media they might have owned in the secondary market once they have media-shifted.

39.     None of these activities are conducted with PEP's authorization, and none of these activities are accompanied by any sort of payment to PEP.

40.     Instead, these activities have driven the demand for original discs down to uneconomically feasible levels, because it has become relatively easy to obtain illicitly, for free or at a nominal cost, products that if legitimate would cost tens of thousands of dollars when purchased at retail.

*THE RIGHTS OF THE PLAINTIFF*

41.     PEP is the owner of U.S. Trademark Registration No. 1,923,448, issued October 3, 1995, and renewed once, for the trademark SOUND CHOICE, for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

42.     PEP is the owner of the U.S. Trademark Registration No. 4,099,052, issued February 14, 2012 for "conducting entertainment exhibitions in the nature of karaoke shows."

43.     PEP is the owner of U.S. Trademark Registration No. 4,099,045, issued February 14,

2012, for the service mark SOUND CHOICE, for "conducting entertainment exhibitions in the nature of karaoke shows."

44.     PEP is the owner of U.S. Trademark Registration No. 2,000,725, issued September 17, 1996, and renewed once, for a display trademark as follows:



for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

45.     PEP and its predecessor have, for the entire time its marks identified above ("the SOUND CHOICE Marks") have been federally registered and provided the public, including the Defendants, with notice of those federal registrations through the consistent display of the symbol ® with its marks as used.

46.     PEP is the owner of distinctive and protectable trade dress associated with its graphical displays (the "Trade Dress"). This distinctive and protectable trade dress includes, at a

8

minimum, (a) the use of a particular typeface, style, and visual arrangement in displaying the lyrics; (b) the SOUND CHOICE Marks; and (c) the use of particular styles in displaying entry cues for singers, namely a series of vanishing rectangles to indicate the cue.

47.    PEP and its predecessor have used its trade dress continuously and substantially exclusively for a period of decades.

48.    The individual and collected elements of the Trade Dress have acquired secondary meaning as an indicator of PEP and its predecessor as a source, effectively functioning as a visual trademark.

49.    The aforementioned Trade Dress serves to distinguish PEP's tracks from the tracks of their competitors, such that persons who are even minimally frequent consumers of karaoke entertainment services such as those provided by the Defendants are capable of identifying a particular karaoke track as originating with PEP simply by examining the Trade Dress or any significant portion thereof, whether or not the SOUND CHOICE Marks are also displayed.

50.    The elements of the Trade Dress represent specific design choices by Slep-Tone; they are but three of many ways to convey the information necessary to permit a karaoke singer to be appropriately supported in his or her performance.

51.    No competitor of PEP is required to use any element of the Trade Dress to accomplish the lyric cueing, and indeed all of the Plaintiff's known competitors are known to use other trade dress in accomplishing the lyric cueing.

### ACTIVITIES OF THE DEFENDANTS

52.    Defendants provide karaoke services in their venues located throughout the New York City area.